52 F.3d 309
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
 Richard SIMONE and Linda Simone, Plaintiffs, Appellants,
v.
WORCESTER COUNTY INSTITUTION FOR SAVINGS, Defendant, Appellee.
 No. 94-1957.
 United States Court of Appeals,
 First Circuit.
April 20, 1995.
 
 Appeal from the United States District Court for the District of Massachusetts [Hon. Nathaniel M. Gorton, U.S. District Judge ]
 Richard Simone and Linda Simone on brief pro se.
 Lucille B. Brennan and Fletcher, Tilton & Whipple, P.C. on brief for appellee.
 D.Mass.
 AFFIRMED.
 Before TORRUELLA, Chief Judge, SELYA and BOUDIN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff-Appellants Richard and Linda Simone ("the Simones") appeal from the district court's affirmance of the bankruptcy court's dismissal of their complaint and allowance of the counterclaim by the defendant, Worcester County Institution for Savings ("WCIS"). They also appeal from the district court's denials of their motion to reconsider pursuant to Fed. R. Civ. P. 59(e) and motion for relief from judgment pursuant to Fed. R. Civ. P. 60(b). "In an appeal from district court review of a bankruptcy court order, we independently review the bankruptcy court's decision, applying the 'clearly erroneous' standard to findings of fact and de novo review to conclusions of law. No special deference is owed to the district court's determinations." Grella v. Salem Five Cent Savings Bank, 42 F.3d 26, 30 (1st Cir. 1994).
 
 
 2
 The Simones argue on appeal that the bankruptcy court erred in concluding that defendant bank did not violate either its common law duty or Mass. Gen. L. ch. 93A in failing to characterize their property as a two-family dwelling when advertising the foreclosure sale of the property. The Simones also contend that the bankruptcy court's error in granting plaintiffs' counsel's motion to sequester all witnesses, including Linda Simone (a party to the case), entitles them to a new trial. Finally, they argue that the district court erred in denying their Rule 60(b)(2) motion seeking relief from the judgment on the ground of "newly discovered evidence" showing partiality of the bankruptcy court judge who presided at the June, 1992 trial.[1]
 
 
 3
 I. Breach of Common Law Duty of Mortgagee to Mortgagor
 
 
 4
 Massachusetts law regarding a mortgagee's responsibility to a mortgagor in the context of a foreclosure sale is as follows:
 
 
 5
 The law governing a mortgagee's responsibility to the mortgagor in the exercise of a power of sale is relatively straightforward. The mortgagee "must act in good faith and must use reasonable diligence to protect the interests of the mortgagor." The mortgagee's duty is more exacting when it becomes the buyer of the property. "When a party who is intrusted with a power to sell attempts also to become the purchaser, he will be held to the strictest good faith and the utmost diligence for the protection of the rights of his principal." Consistent with these requirements, the mortgagee has a duty "to obtain for the property as large a price as possible."
 
 
 6
 Williams v. Resolution GGF Oy., 417 Mass. 377, 382-83 (1994) (citations omitted). However, "[t]he rule that 'mere inadequacy of [the foreclosure sale] price alone does not necessarily show bad faith or lack of due diligence' has been repeated or applied by this court in many cases." Seppala & Aho Construction Co. v. Peterson, 373 Mass. 316, 328 (1977).
 
 
 7
 The bankruptcy court made the following factual findings at the June 4, 1992, proceeding:
 
 
 8
 I find that the fair market value of the property at the time of the sale was $135,000.... I find that it was more likely than not-whether or not the sale was advertised as a two-family sale or as a sale with an in-law apartment or words of that affect ... that in June of '91, it was more likely than not that no qualified bidders would appear who would be prepared to bid more than seventy percent of fair market value. I find that the bank acted in accordance with custom that has developed over the last few years in bidding in at what it believed to be seventy percent of the fair market value.... I do find that there were code violations, and ... this property as a two-family, would have been in violation of the zoning bylaw ..., even though a certificate of occupancy had been issued.
 
 
 9
 In light of those findings, the court ruled that the advertisements placed by WCIS were not unreasonable. The appraiser, on whom the bank relied, "was not acting unreasonably in determining that this was essentially a ... single-family home."
 
 
 10
 The burden is on appellants to prove that the bankruptcy court's factual findings are clearly erroneous. See In re Payeur, 22 B.R. 516, 519 (U.S. Bankruptcy Panel for the First Circuit, 1982). Under the "clear error" standard of review, reversal is warranted only if after reviewing the entire record, the reviewing court is left with a " 'definite and firm conviction that a mistake has been committed.' " I.C.C. v. Holmes Transp., Inc., 983 F.2d 1122 (1st Cir. 1993) (citation omitted).
 
 
 11
 WCIS hired ATR Appraisal Consultants ("ATR") to prepare two appraisals of the subject property, one in November, 1990 (prior to the first scheduled sale of the property, which was postponed when the Simones filed for bankruptcy) and one in May, 1991 (prior to the second scheduled sale of the property). The November appraisal noted in an addendum that the property consisted of a "multi-level style dwelling with finished basement set up as an in-law apartment." ATR explained its decision to treat the dwelling as a single- family as follows:
 
 
 12
 As the basement apartment contained windows which did not appear to be code and as its present layout created functional problems, the subject was treated as a single family residence with finished basement. It should also be noted that current zoning requirements require an 8,000 sq. ft. lot for a two family dwelling. It is not known if a permit was filed in order to obtain a variance to allow for a two-family building.
 
 
 13
 The November report estimated the market value of the property to be $144,000.
 
 
 14
 ATR's May 1991 report, noting that "market appears to be declining," estimated the property's market value to be $135,000. The second appraisal also treated the dwelling as a single-family given the condition of the unit revealed by the November, 1990 inspection. (ATR was unable to re-enter the apartment for inspection in May, 1991.) Both reports relied primarily upon the "Sales Comparison Approach" as yielding the most accurate estimate of the property's market value. ATR noted that "[t]ypically the price paid at foreclosure is substantially less than the indicated Market Value of the foreclosed property." The May 1991 report estimated a foreclosure sale value of between $108,000 and $115,000.
 
 
 15
 The Simones contend that ATR's appraisals were unreasonable in failing to treat the dwelling as a two-family and in failing to apply the "income approach" to estimating its market value. That contention is undercut, however, by their own appraiser's report. Thomas Head, an appraiser hired by the Simones, testified at trial that his November, 1991 appraisal, which treated the dwelling as a two-family, estimated the market value of the property at that time to be $135,000. Therefore, whether treating the dwelling as a single-family with a finished basement or as a two-family, the appraisals arrived at the same estimated market value. In addition, ATR researched the value of the property as a two-family dwelling and concluded in a June 18, 1991 letter to WCIS that the estimated value would remain in the $135,000 to $145,000 range.
 
 
 16
 At trial, Kimberly Comeau (one of the two ATR appraisers who prepared the reports) testified that her visit to the Building Department for the City of Worcester had revealed that current zoning required a minimum lot size of 8,000 square feet for a two-family dwelling at the relevant location. Given that the subject lot contained only 7,960 square feet and that there was no evidence that a special permit had been granted, Ms. Comeau concluded that the use of the property as a two-family dwelling would violate the applicable zoning laws. The Simones argue that the Certificate of Occupancy issued to them by the Building Department in 1987, when they converted the basement to an apartment, demonstrates that the unit does not violate the zoning laws.
 
 
 17
 Even assuming, without deciding, that ATR erred in concluding that the use of the property as a two-family dwelling violated the zoning laws, that error would not invalidate its estimate of market value or its treatment of the dwelling as a single-family. As Ms. Comeau stated at trial, ATR's decision to appraise the dwelling as a single-family dwelling was based upon a conclusion that "the highest and best use of the subject property was as a single-family residence." She explained that she believed that the property would not be purchased as a two-family for the following reasons:
 
 
 18
 Well, based on our findings upon the inspection in which the layout of the basement unit was awkward and unconventional. We also had some questions as to possible code violations. In addition, we did consider the two- family market; and due to risk involved in the two-family market, we determined that the highest and best use of the property was that of a single-family.
 
 
 19
 A May 17, 1991, Code Inspection Report noted several violations in the basement apartment. Although that report was not received by WCIS until after the sale of the property, it confirms ATR's impression (noted in its reports) that code violations were present in the basement unit.[2]
 
 
 20
 WCIS admits that it considered the income from the second unit in granting a second mortgage on the subject property and that it insured the property as a two-family. Those decisions, however, may merely reflect the actual use of the property as a two-family dwelling at the relevant times. It does not necessarily follow, and the Simones have failed to demonstrate, that WCIS was obligated to advertise the property as a two-family because it was being used as such at the time of the sale. ATR determined that single-family occupancy was the "highest and best use of the property", i.e., "the most profitable and feasible" use. WCIS reasonably relied upon that determination in advertising the property.
 
 
 21
 The Simones argue that if the property had been advertised as a two-family dwelling, there would have been more bidders and, consequently, a higher purchase price would have resulted. Plaintiff's professional auctioneer witness, however, only testified that if the property were advertised as a two-family, it would have attracted a "different audience." Given ATR's reasonable conclusion that the "highest and best use" of the property was as a single-family, WCIS' decision to advertise it as such did not violate its duty to the Simones.
 
 
 22
 Based upon the above evidence, we conclude that the bankruptcy court did not err in dismissing the complaint. After reviewing the entire record, we are not left with the "definite and firm conviction," I.C.C. v. Holmes Transp., Inc., 983 F.2d at 1129, that the bankruptcy court's conclusion that WCIS acted in good faith was mistaken. Nor are we persuaded that the court was mistaken in concluding that WCIS reasonably relied upon ATR's determination that the property was essentially a single family home.[3] The bankruptcy court properly concluded that the Simones failed to prove that the advertisement and sale of the foreclosed property amounted to a breach of WCIS' common law duty to the Simones.
 
 II. Mass. Gen. L. ch. 93A Violation
 
 23
 The complaint also alleged that WCIS' advertisement and sale of the foreclosed property violated c. 93A Secs. 2 and 9. Section 2(a) of chapter 93A makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 9 authorizes suit by "[a]ny person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two...." Section 11 authorizes suit by persons who "engage[ ] in the conduct of any trade or commerce."
 
 
 24
 It is unclear, and neither the bankruptcy court nor the district court addressed the issue, whether the Simones were "engaged in the conduct of trade or commerce" and, therefore, required to bring suit under Sec. 11. The test is "whether the defendant's conduct giving rise to the 93A violation occurred in connection with ... a plaintiff individual acting in a business context." Michael C. Gilleran, The Law of Chapter 93A Sec. 8.5 (1989 & Supp. 1994). At the time of the foreclosure and sale, the Simones were renting the subject dwelling to two families, and were no longer living there themselves. Section 1(b) defines trade and commerce to include "the rent ... of ... any property."
 
 
 25
 It is unnecessary to resolve this issue, however, since the Simones have failed to meet the requisite standard under either Sec. 11 or Sec. 9. "The defendant in a Sec. 9 case will or will not have violated Sec. 9 depending on whether the defendant acted in an equitable manner toward the plaintiff. The equity standard in Sec. 9 cases requires that the defendant's conduct not have violated some established concept of unfairness or otherwise be immoral, unethical, oppressive or unscrupulous." M. Gilleran, supra, Sec. 4.7 (citing cases); see also Gerli v. G.K. Hall & Co., 851 F.2d 452, 454 (1st Cir. 1988). "A plaintiff claiming unfairness under Sec. 11 must show rascality, that is, a violation of conventional business ethical norms." M. Gilleran, supra, Sec. 4.8 (citing cases); see also Midwest Precision Services, Inc. v. PTM Inds. Corp., 887 F.2d 1128, 1139 (1st Cir. 1989).
 
 
 26
 The bankruptcy court specifically found that WCIS acted in good faith and that it behaved in a commercially reasonable manner. Given those findings, which were not clearly erroneous, we conclude that the Simones failed to establish that WCIS' conduct violated Mass. Gen. L. ch. 93A. Therefore, the bankruptcy court did not err in dismissing that claim.
 
 III. Sequestering of Witnesses
 
 27
 The Simones argue on appeal, as they did in their motion for reconsideration, that the sequestering of Linda Simone during the trial violated their rights. Fed. R. Evid. 615 provides, in relevant part, as follows:
 
 
 28
 At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person....
 
 
 29
 The district court ruled as follows in response to the Simones' motion for reconsideration:
 
 
 30
 Having reviewed the trial transcript in connection with appellants' contention that Linda Simone was improperly sequestered at trial, and having concluded that she was sequestered pursuant to the motion of counsel for the Simones, it is hereby Ordered that appellants' motion to reconsider is DENIED.
 
 
 31
 We agree with the district court that by moving for the sequestration of witnesses, specifically including Linda Simone, and by failing to object during the bankruptcy proceeding to the sequestering of Linda Simone, the Simones waived the issue. Cf. United States v. Abbott, 30 F.3d 71, 73 (7th Cir. 1994) (failure to move for exclusion of witness at trial constitutes waiver of argument on appeal that court erred in failing to exclude witness); Hull v. Merck & Co., 758 F.2d 1474, 1478 (11th Cir. 1985) (denying request for new trial where plaintiff had been excluded from courtroom in violation of Fed. R. Evid. 615(1), but plaintiff-after returning to the courtroom-agreed to proceed with trial). Moreover, the Simones have failed to demonstrate any prejudice as a result of Linda Simone's exclusion from the courtroom. See United States v. Bobo, 586 F.2d 355, 366 (5th Cir. 1978) (party seeking reversal on basis of violation of Fed. R. Evid. 615 must demonstrate prejudice therefrom), cert. denied, 440 U.S. 976 (1979).
 
 IV. Partiality Claim
 
 32
 The Simones argue that the Bankruptcy Judge ought to have disqualified himself from presiding over the June 4, 1992, trial. They argue that his previous employment as an attorney at a law firm where defense counsel was then working as a paralegal, required his recusal. They further suggest an additional conflict: that the judge's former law firm represented WCIS. A motion for recusal was not made to the bankruptcy court. Instead, the Simones raised the partiality issue for the first time in their Rule 60(b)(2) motion for relief from judgment on the ground of newly discovered evidence. The motion was filed and denied while the Simones' motion for reconsideration pursuant to Fed. R. Civ. P. 59(e) was pending. The Simones did not appeal from the denial of their Rule 60(b) motion and WCIS argues that, therefore, they have waived the issue. We need not decide the question of waiver since we conclude that the partiality claim is entirely without merit.
 
 
 33
 WCIS admits that its counsel "from October, 1978 through June 1985, ... was a paralegal employed at the law firm of Bowditch & Dewey and during that time often worked with Judge Queenan, who, during that same period, was a lawyer and member of the firm." Contrary to the Simones' contention on appeal, however, those circumstances do not require recusal. The relevant statute provides as follows:
 
 
 34
 Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 
 
 35
 28 U.S.C. Sec. 455. This court has interpreted the statute to require disqualification " 'only if the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality.' " In re Allied Signal, Inc., 891 F.2d 967, 970 (1st Cir. 1989) (citations omitted), cert. denied, 495 U.S. 957 (1990). WCIS' counsel's employment, seven years earlier, as a paralegal at the firm where the Bankruptcy Judge then worked as an attorney, and her work with the Judge, on matters unrelated to the present controversy, do not provide a "reasonable basis for doubting the judge's impartiality" in this case. See Singer v. Wadman, 745 F.2d 606, 608 (10th Cir. 1984) (holding that judge's former partnership with a lawyer for one of the defendants did not require disqualification), cert. denied, 470 U.S. 1028 (1985).
 
 
 36
 Nor does the Simones' allegation that the Bankruptcy Judge's former law firm represented WCIS require recusal. "[A] charge of partiality must be supported by a factual basis." Allied Signal, 891 F.2d at 970. Here, the Simones have provided only the following vague suggestion of partiality:
 
 
 37
 [The Bankruptcy Judge] at one point either worked at the Law Firm of Bowdwitch & Dewey of Worcester Ma. or Fletcher Tilton & Whipple of Worcester, Ma. and ... either of these two Firms handled the accounts for W.C.I.S. Bank.
 
 
 38
 Even if the factual basis were adequate, the alleged relationships would not necessarily require recusal. See National Auto Brokers v. General Motors Corp., 572 F.2d 953 n.9 (2d Cir. 1978) (citing Sec. 455(b)(2) and noting that "[e]ven under the more stringent requirements of the current statute, ... the prior representation of [defendant] by [judge's prior law firm and judge] as to unrelated matters would not require him to recuse himself"), cert. denied, 439 U.S. 1072 (1979).
 
 
 39
 For all the foregoing reasons, we affirm the district court's affirmance of the bankruptcy court's dismissal of this case.
 
 
 
 [1]
 The Simones' brief contains myriad vague and unsupported claims of tampering with evidence and improper behavior by counsel for both parties. We reject those claims as completely unsupported by the record
 
 
 [2]
 The code inspection was performed in response to reports of violations by the upstairs tenant, who allegedly offered to purchase the property for $154,900 in February, 1991. The Simones cite the offer as evidence that WCIS could have obtained a higher price for the property if it had been advertised as a two-family. Mr. Simone admitted at his deposition, however, that the sale fell through for unknown reasons
 
 
 [3]
 We note that the record indicates that the Simones did not object to the advertisement of the dwelling as a single- family until after the sale occurred, although the first advertisement was published approximately six months earlier, in November, 1990