*In re* PEDRO COLTON FONTÁN, OSVALDO VILLANUEVA DÍAZ, AURELIO MIRÓ CARRIÓN, ÁNGEL FIGUEROA VIVAS y JUAN E. BRUNET JUSTINIANO.

*Número:* CE-86-666          *Resuelto:* 23 de septiembre de 1996

572

*Nilka Marrero García*, abogada del peticionario.

Decisión del Juez Asociado Señor Hernández Denton referente a Moción sobre Recusación.

Acorde con los pronunciamientos en *Noriega Rodríguez v. Gobernador*, 120 D.P.R. 267 (1988), se nos ha referido para que evaluemos la moción presentada por Ángel Figueroa Vivas en la que solicita nuestra inhibición en la adjudicación de su Petición Solicitando Reapertura de Procedimiento de Desaforo, Fundamentada en Fraude al Tribunal Debido a Ocultación de Prueba Exculpatoria y Favorable.(¹)

I

Figueroa Vivas expone dos (2) circunstancias que, a su juicio, ameritan nuestra inhibición. Primero, sostiene que en 1980 ocupamos una posición directiva en la campaña electoral del ex Gobernador Rafael Hernández Colón y tuvimos una "estrecha vinculación ... con la publicación y difusión masiva de los hechos del Cerro Maravilla" (Moción solicitando inhibición Juez Asociado Honorable Federico Hernández Denton, pág. 1) que efectuó el entonces candidato a la gobernación. Aduce que durante esa campaña se creó una "opinión pública adversa al compareciente". En esencia, el señalamiento implica prejuicio contra él.

Es de conocimiento público que ocupamos una posición directiva en la campaña electoral de 1980 del ex Gobernador Rafael Hernández Colón y que los sucesos del Cerro Maravilla constituyeron uno de los temas principales de

_____

(¹) Debido a la inhibición del Juez Presidente Señor Andréu García, mediante Memorandum de 16 de agosto de 1996 el Juez Asociado Señor Negrón García nos remitió la moción presentada por Ángel Figueroa Vivas.

esa elección. Sin embargo, no es correcto que la estrategia publicitaria fuera orientada a crear una opinión pública adversa a la figura del peticionario Figueroa Vivas ni que estábamos prejuiciados contra él o los demás querellados. Durante esos comicios electorales no se llevó a cabo una campaña publicitaria contra el peticionario o alguno de los Fiscales querellados.

Tampoco intervenimos en la investigación que en el 1981 inició el Senado de Puerto Rico sobre lo ocurrido en el Cerro Maravilla. Como resultado de esa investigación, en el 1984 el Senado sometió a la consideración del Tribunal Supremo un informe sobre la conducta profesional de los entonces Fiscales, Pedro Colton Fontán, Ángel Figueroa Vivas, Santos Nigaglioni Estrada, Aurelio Miró Carrión y Osvaldo Villanueva. Se les imputaba que habían violado los cánones del Código de Ética Profesional en la investigación que realizaron sobre lo ocurrido en el Cerro Maravilla. Este informe fue remitido al Fiscal Especial Independiente (F.E.I.) y eventualmente culminó en el desaforo de Figueroa Vivas y de otros Fiscales.

Esa fue la investigación que en las elecciones de 1984 constituyó uno de los temas principales del debate público. Para 1984 ocupábamos la posición de Decano de la Facultad de Derecho de la Universidad Interamericana y no participamos en campaña electoral alguna. Los anuncios incluidos en el apéndice de la moción, que contienen una referencia a Figueroa Vivas y a los otros querellados, corresponden a esas elecciones y no a las de 1980. En modo alguno intervenimos en esa campaña publicitaria.

Al tomar posesión del cargo de Juez Asociado el 14 de junio de 1985, no teníamos conocimiento de los hechos específicos que originaron las querellas presentadas por el Senado ni habíamos expresado criterio alguno sobre la procedencia de los cargos imputados a Figueroa Vivas y los demás Fiscales. Tampoco mantuvimos una relación profesional previa con el caso o con cualquiera de las partes,

incluso el querellado. El conocimiento que podíamos tener se limitaba a la información publicada por la prensa del país, lo cual nos situaba en la misma posición que cualquier otro ciudadano interesado en nuestra sociedad y, naturalmente, atento a las noticias. La preocupación expresada por Figueroa Vivas es infundada.

## II

Figueroa Vivas también nos solicita la inhibición por razón de que la Lcda. María Teresa Szendrey Ramos, hija de la Fiscal Delegada del F.E.I., Lcda. Maricarmen Ramos de Szendrey, era una de los Oficiales Jurídicos del Juez suscribiente cuando se emitió la opinión del Tribunal en 1991. A juicio suyo, ello constituye una circunstancia que razonablemente arroja dudas sobre nuestra imparcialidad.

Una moción análoga fue presentada hace cinco (5) años por Pedro Colton Fontán, quien solicitó nuestra inhibición en la reconsideración de la opinión y sentencia del Tribunal en *In re Colton Fontán*, 128 D.P.R. 1 (1991). Denegamos su pedido porque cuando se sometió la querella para adjudicación final por el Tribunal, tomamos las medidas cautelares apropiadas. La licenciada Szendrey no nos asistió en el estudio de la opinión circulada por el Juez Asociado Señor Negrón García. En aquel momento no consideramos necesario expresarnos por escrito; sin embargo, la petición de Figueroa Vivas nos ha convencido que debemos hacerlo y exponer las salvaguardas internas adoptadas en su origen. Su petición también nos permite examinar la normativa aplicable a situaciones análogas.

Al evaluar su moción, tenemos presente "que la inhibición de un Juez de este Tribunal revist[e] interés excepcional". *Noriega Rodríguez v. Gobernador*, supra, pág. 276. A diferencia de los jueces del Tribunal de Primera Instancia y del Tribunal del Circuito de Apelaciones, la inhibición de uno de los miembros de esta Curia no conlleva

su sustitución. Como nuestras decisiones exigen *quórum* y una votación mayoritaria, tenemos que ponderar con particular cuidado cualquier petición de inhibición para asegurar que el Tribunal pueda decidir las controversias jurídicas ante su consideración según los preceptos constitucionales y las normas legales y jurídicas establecidas. *Noriega Rodríguez v. Gobernador*, supra, pág. 276.

Tenemos siempre presente que la inhibición de uno de los Jueces puede dar lugar a un empate en la votación que impida un pronunciamiento final del tribunal de última instancia en Puerto Rico en un asunto de importancia pública.

Recientemente, el Juez Presidente y seis (6) Jueces Asociados del Tribunal Supremo federal hicieron el siguiente pronunciamiento sobre estos extremos:

> We do not think it would serve the public interest to go beyond the requirements of the statute, and to recuse ourselves, out of an excess of caution, whenever a relative is a partner in the firm before us or acted as a lawyer at an earlier stage. Even one unnecessary recusal impairs the functioning of the Court. Given the size and number of today's national law firms, and the frequent appearance before us of many of them in a single case, recusal might become a common occurrence, and opportunities would be multiplied for "strategizing" recusals, that is, selecting law firms with an eye to producing the recusal of particular Justices. In this Court, where the absence of one Justice cannot be made up by another, needless recusal deprives litigants of the nine Justices to which they are entitled, produces the possibility of an even division on the merits of the case, and has a distorting effect upon the certiorari process, requiring the petitioner to obtain (under our current practice) four votes out of eight instead of four out of nine. *Statement of Recusal Policy*, del Juez Presidente Rehnquist y los Jueces Asociados Señores Stevens, Scalia, Thomas, O'Connor, Kennedy y Ginsburg (1ro de noviembre de 1993), reproducido en R.E. Flamm, *Judicial Disqualification*, Boston, Ed. Little, Brown and Co., 1996, pág. 1069. Véanse, también: *Laird v. Tatum*, 409 U.S. 824 (1972) (Memorando del Juez Asociado Señor Rehnquist, a propósito de una moción sobre su recusación); Nota, *Justice Rehnquist's De-*

*cision to participate in Laird v. Tatum*, 73 Colum. L. Rev. 106 (1973).

█ Además, hay que recordar que en los tribunales apelativos los jueces, de ordinario, están sujetos a unas limitaciones que les imponen las tradiciones y la propia naturaleza del foro colegiado. Esto asegura que las decisiones reflejen el criterio mayoritario y estén basadas en el derecho aplicable, y no en sus opiniones personales sobre los méritos de la controversias ante su consideración:

> In the collegial decision-making of an appellate court, an individual judge's purely personal views are of less significance than they would be in a trial court and are subject to collegial restraint should the judge be inclined to act upon them; an appellate judge has few occasions for exercising the broad discretion reposed in a trial judge; and in appellate litigation there is no occasion for the intense personal interaction between the judge and the lawyers and litigants that may occur in a trial court. Moreover, an appellate judge's public views on law and justice, to a certain extent, are a proper element of the contribution the judge makes to the function of an appellate court, particularly in the development of the law. *ABA, Judicial Administration Division, III, Standards of Judicial Administration: Standards Relating to Appellate Courts* Sec. 3.42, pág. 81 (1994).

█ La tradición en este Foro colegiado ha sido inhibirnos "(1) por razón del *objeto del litigio*, cuando existe un vínculo de interés moral o material entre lo que se debate y la figura del magistrado; (2) por *razón de las partes en conflicto*, amistad o enemistad entre el juez y los litigantes; y (3) por *razón de los foros llamados a intervenir*, como por ejemplo, haber intervenido previamente como abogado, consejero o juez en el pleito". (Énfasis en el original.) *Santiago v. Superintendente de la Policía*, 112 D.P.R. 205, 214 (1982), voto de inhibición del Juez Asociado Señor Negrón García.

█ Estas causales son análogas a las que rigen en el Tribunal Supremo de Estados Unidos, donde los "Jueces se

inhiben cuando tienen un interés pecuniario; cuando tienen una relación de parentesco con una parte y, recientemente, cuando están relacionados con uno de los abogados de las partes; cuando el asunto particular estuvo en una de las oficinas de abogados mientras él estuvo asociado a ella; o si cuando estuvo en el gobierno trató el asunto particular y el caso particular que ahora está ante su consideración; de lo contrario, generalmente, no procede su inhibición". (Traducción nuestra.) J.P. Frank, *Disqualification of Judges: In Support of the Bayh Bill*, 35 Law & Contemp. Probs. 43, 50 (1970).

■ Estas normas tienen como denominador común la existencia de un vínculo directo del magistrado con las partes, sus abogados o el objeto del litigio, que activa un tipo de presunción de parcialidad por relaciones previas personales del juez. Estas causales están concebidas para limitar la conducta del magistrado. Sin embargo, no requieren que éste se inhiba automáticamente por razón de un conflicto de interés que tenga un oficial jurídico o un empleado adscrito a su despacho.

■ Aunque un oficial jurídico está impedido de hacer lo que un juez no puede hacer, esto no significa que el magistrado tenga que recusarse cuando el oficial jurídico esté impedido de asistirlo. *Hunt v. American Bank & Trust Co. of Baton Rouge*, 783 F.2d 1011, 1016 (11mo Cir. 1986); Canon XI del Código de Ética Judicial, 4 L.P.R.A. Ap. IV-A; Anotación, *Conduct or Bias of Law Clerk or Other Judicial Support Personnel as Warranting Recusal of Federal Judge or Magistrate*, 65 A.L.R. Fed. 775 (1983). De hecho, para propósitos de recusación, siempre se ha reconocido que las opiniones de un oficial jurídico no son atribuibles al juez. De lo contrario, la participación de un juez en un caso también dependería de las opiniones, relaciones personales y conducta de sus oficiales jurídicos. Flamm, *op. cit.*, Sec. 9.5, pág. 274.

■ Además, somos conscientes de que cada juez tiene sus propios criterios sobre las tareas que se les asignan a sus oficiales jurídicos. Sin embargo, "[t]anto los tribunales como los abogados reconocen que son los jueces y no los oficiales jurídicos los que toman las decisiones en las controversias ante su consideración". (Traducción nuestra.) *In re Allied-Signal, Inc.*, 891 F.2d 967, 971 (1er Cir. 1989).

■ En los casos en que se cuestiona la "apariencia de parcialidad" de un juez por razón de las relaciones de su oficial jurídico, los tribunales consistentemente han resuelto que el procedimiento que ha de seguirse es que el oficial jurídico no asista al juez en el caso. A modo de ejemplo, el undécimo circuito de la Corte de Apelaciones de Estados Unidos ha adoptado la regla de que "[s]i un oficial jurídico tiene un conflicto de interés potencial, es el oficial, no el juez, quien debe ser descalificado". (Traducción nuestra.) *Hunt v. American Bank & Trust Co. of Baton Rouge*, supra, pág. 1016.

Esta norma es aplicable tanto en los foros de primera instancia como en los tribunales apelativos. Así se evita que el oficial asista al juez en las investigaciones del caso particular en el cual no debe intervenir. En los Tribunales Supremos como el nuestro donde, como regla general, los Jueces tienen más de un oficial jurídico, esta medida es fácil de implantarse. En estos casos se acostumbra asignarle el trabajo a otro oficial jurídico, que no tenga conflicto, y se toman las medidas correspondientes para aislar al empleado con el conflicto.

Esta medida es aplicable tanto en los casos en que un oficial jurídico participa en asuntos en que su próximo patrono es el abogado de una de las partes, como en los que es un pariente muy cercano del oficial. Véanse: *In re Kansas Public Employees Retirement System*, 85 F.3d 1353, 1364 (8vo Cir. 1996); *Parker v. Connors Steel Co.*, 855 F.2d 1510 (11mo Cir. 1988); *In re Allied-Signal, Inc.*, supra.

Precisamente, esa fue la norma que adoptamos en *In re Cardona Álvarez*, 116 D.P.R. 895, 907–908 (1986). En esa ocasión una de las partes imputó que el juez del Tribunal de Primera Instancia había juzgado con prejuicio y parcialidad porque el oficial jurídico era hermano del abogado de una de las partes. Dijimos:

> Un examen de los autos relativos al incidente en el caso ... nos convence de que existió una preocupación legítima sobre la intervención o grado de participación del Oficial Jurídico del Juez Honorable Díaz Laureano. Esa inquietud y duda quedó aclarada por el propio magistrado. De la misma resultó errónea la apreciación en cuanto a la intervención activa y directa de un Oficial Jurídico hermano de quien había sido abogado de una de las partes. Antes de levantarlo, por vía de reconsideración en este foro apelativo, Cardona Alvarez debió primeramente haberlo planteado a dicho juez para que éste esclareciera sus dudas.

■ Estas salvaguardas preventivas evitan que exista "una apariencia de parcialidad" en el juzgador al tener entre su personal jurídico a una persona relacionada con uno de los abogados de las partes. La mera existencia de un conflicto por parte del oficial jurídico no significa que el juez esté impedido de juzgar o que exista "la apariencia de parcialidad" que socave la confianza pública en la Judicatura. Sin embargo, el alejamiento del oficial jurídico del caso ante la consideración del juez es una medida prudencial que garantiza la pureza de los procedimientos y despeja cualquier duda que un observador desinteresado y totalmente informado de los hechos pueda tener sobre la imparcialidad del magistrado. Véanse sobre esta doctrina a *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111 (5to Cir. 1980); *Hunt v. American Bank & Trust Co. of Baton Rouge*, supra, pág. 1015; *In re Allied-Signal, Inc.*, supra, pág. 970; *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703 (9no Cir. 1990).

## III

En el caso particular ante nuestra consideración, Figueroa Vivas expone que la relación filial entre la Lcda. María Teresa Szendrey y uno de los Procuradores de la Oficina del entonces Fiscal Especial Independiente creó una apariencia de parcialidad en el Juez suscribiente. En su petición no demuestra cómo esta relación erosionó nuestra imparcialidad y objetividad, cuando originalmente este Tribunal, por voz del Juez Asociado Señor Negrón García, lo separó permanentemente del ejercicio de la abogacía. Tampoco explica por qué este hecho puede afectar nuestra valorización de su petición de reapertura presentada cinco (5) años después que la oficial jurídico renunció y comenzó a trabajar en otro lugar.

No obstante, al evaluar su petición a tenor con la regla adoptada en *Noriega Rodríguez v. Gobernador*, supra, pág. 267, recordamos que para recibir y evaluar la prueba que tenía el Fiscal Especial Independiente contra los querellados, este Tribunal nombró un Comisionado Especial, al Hon. Abner Limardo. Como se desprende de la opinión en *In re Colton Fontán*, supra, el Juez Limardo celebró unas vistas durante veinticuatro (24) días en las que recibió prueba documental y testifical, y oportunamente nos sometió un extenso y fundamentado informe con sus conclusiones de hechos.

Una vez este Tribunal recibió dicho informe, se les concedió un término razonable a los querellados para exponer sus posiciones. Concluido este proceso, el caso fue asignado al Juez Asociado Señor Negrón García quien, basándose en un detenido análisis de la abundante prueba documental, así como de la transcripción de los testimonios y de las determinaciones del Comisionado Especial, preparó una ponencia la cual circuló entre todos los Jueces de este Tribunal para estudio y consideración. Después de evaluar

cuidadosamente la opinión y el informe del Comisionado Especial, así como la prueba y diversos elementos de juicio, la endosamos.

En lo que respecta a la participación de la licenciada Szendrey Ramos en este proceso, ella en ningún momento nos asistió en el estudio de la ponencia circulada ni tuvo acceso a ésta. De hecho, antes de ella comenzar a trabajar con nosotros en octubre del 1990, informamos a los miembros del Tribunal de su relación filial con uno de los Procuradores del procedimiento disciplinario que se estaba llevando contra los Fiscales querellados. Aun cuando la asignación del caso para la preparación de la opinión del Tribunal había recaído en otro miembro de esta Curia, una vez se circuló la ponencia tomamos las medidas correspondientes para que ella *no* nos asistiera en su evaluación. La labor recayó en otro de nuestros oficiales jurídicos.

A través de todo este proceso, la licenciada Szendrey Ramos cumplió estricta, recta y éticamente con todas estas medidas cautelares.

Por último, siempre hemos estado "en total libertad, ánimo y disposición de juzgar los asuntos planteados [en estas querellas] con imparcialidad, ecuanimidad y objetividad". Véase decisión del Juez Presidente Señor Pons Núñez en *Noriega Rodríguez v. Gobernador*, 120 D.P.R. 417, 421 (1988). Con este derrotero en mente, y la tranquilidad de hombre justo, denegamos la moción de inhibición de Figueroa Vivas.

*Únase a los autos y notifíquese a las partes, a la Oficina del Procurador General y al Colegio de Abogados para su publicación.*