**In re CARGILL, INC., Petitioner.**

**No. 94–8042.**

United States Court of Appeals,
First Circuit.

Heard Jan. 12, 1995.

Decided Oct. 10, 1995.

---

Bernhardt K. Wruble, with whom William R. Sherman, Verner, Liipfert, Bernhard, McPherson and Hand, Washington, DC, Peter J. DeTroy, III and Norman, Hanson & DeTroy, Portland, ME, were on brief, for petitioner.

Joel C. Martin, with whom Michael K. Martin, Daniel W. Bates and Petruccelli & Martin, Portland, ME, were on brief, for plaintiffs.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

Petitioner, Cargill, Inc. (Cargill), seeks a writ of mandamus directing a judge of the United States District Court for the District of Maine to withdraw a decision previously issued and then to recuse himself from further proceedings in the underlying cause.[1] For the reasons that follow, we decline to issue a prerogative writ.

## I. BACKGROUND

The petition arises out of a civil action brought by several former Cargill employees, represented by Daniel W. Bates and Kenneth

---

1. Petitioner premises his argument on the ground that the judge's impartiality might reasonably be questioned. The relevant statute provides:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

28 U.S.C. § 455(a) (1988).

D. Keating of Petruccelli & Martin (P & M), an eight-lawyer firm in Portland, Maine. The complaint invokes the Robinson–Patman Act, 15 U.S.C. §§ 13–13b (1988), and alleges in substance that Cargill discharged the plaintiffs in retaliation for their unwillingness to abide certain predatory pricing practices. Cargill retained a Washington-based firm, Verner, Liipfert, Bernhard, McPherson, and Hand (Verner, Liipfert), as lead counsel, and a Portland firm, Pierce, Atwood, Scribner, Allen, Smith, and Lancaster (Pierce, Atwood), as local counsel. It then moved to dismiss on the basis that the plaintiffs experienced no antitrust injury and, therefore, lacked standing to maintain the action.

On December 19, 1993, while Cargill's motion was pending before him, the district judge to whom the case had been randomly assigned became embroiled in what he subsequently described as a "minor controversy" relating to his efforts, and those of his wife, to purchase a new home. The judge telephoned Gerald Petruccelli, a principal partner in P & M, and sought his advice anent the real estate dispute. Petruccelli agreed to the proposed representation, telling the judge that he (Petruccelli) knew of "no impediment" to the relationship.

On December 21, the two men met for about 50 minutes and discussed the judge's real estate problem. A series of telephone conversations followed over the course of the next eight days. None lasted more than five minutes. Petruccelli dealt directly with the lawyer who represented the other side in the real estate matter and, on January 6, 1994, he resolved the imbroglio to the judge's satisfaction. Petruccelli rendered a bill, dated January 7, based on his standard hourly rate. The judge paid the invoice within the week. It is undisputed that Petruccelli never represented the judge in any other matter and that the judge dealt only with Petruccelli (not with any other P & M attorney).

The judge maintains that, at the time he engaged counsel, he had "no conscious awareness that Mr. Petruccelli or his firm

were involved in this specific litigation then pending" before him.[2] Nonetheless, a few days after he had retained Petruccelli, the judge asked his docket clerk to check his calendar for pending cases in which P & M might have appeared. The clerk brought two such cases to the judge's attention at about the time that the attorney-client relationship ended. One of these was the case against Cargill. Although Petruccelli himself had played no role in P & M's representation of the plaintiffs, the judge decided that he had best disclose his dealings with Petruccelli.

On January 11, the clerk, acting at the judge's direction, notified local counsel to attend a conference on the following day. The disclosure conference (a transcript of which comprises the appendix) proved to be brief. Attorneys Bates and Keating appeared for the plaintiffs, and Attorneys O'Leary and Einsiedler (both of Pierce, Atwood) appeared for Cargill. When advised of the attorney-client relationship between Petruccelli and the judge, both Bates and O'Leary quickly volunteered that their respective clients had no objection to the judge's continued participation in the case. The judge then advised the lawyers that he was grappling with Cargill's motion to dismiss which, in his view, "raise[d] some very interesting and difficult questions." He forecast that he would hand down a decision "within a week or so."

Precisely one week thereafter, the judge issued a 39–page rescript denying Cargill's motion to dismiss. While the judge closed his chambers and released his staff on holiday leave from December 24, 1993 through January 3, 1994, he admittedly labored over the matter during some portion of the period when Petruccelli represented him.

The filing of the opinion elicited no immediate response. Several weeks later, however, Bernhardt Wruble, a Verner, Liipfert partner, wrote a letter to the court asserting that, because "a judge's contemporaneous representation by opposing counsel is uni-

---

**2.** This declaration, and other declarations reflecting the judge's state of mind, are extracted from the record of a conference held in this case (reprinted in the appendix), from the judge's notice to counsel (described *infra*), and from the order denying Cargill's recusal motion. For the most part, petitioner has not challenged the factual accuracy of the judge's statements.

formly regarded as a basis for obligatory disqualification," the judge should withdraw his order denying the motion to dismiss, relieve himself of all responsibility for the case, and reassign it to another jurist. Anticipating the predictable reaction to this demand, Wruble suggested that Pierce, Atwood's acquiescence was of no moment. Since local counsel lacked prior notice of the purpose of the January 12 conference and, hence, had no opportunity to consult in advance with either the client or lead counsel, Wruble wrote, the judge had not afforded petitioner "adequate time for a considered response" to the disclosure. Thus, there could be no "effective" waiver.

The judge did no fewer than three things upon receiving Wruble's communique. First, he postponed a scheduled status conference in the case. Second, he directed any party who sought his recusal to file a formal motion to that effect. Third, he composed and served a statement, denominated as a notice to counsel, in which he denied "that the Court required a decision on waiver of any objection to the Court's continued participation to be made at the conference." The judge explained that he meant the disclosure conference to be informational in nature, that is, "to advise counsel of the circumstances of Mr. Petruccelli's representation and afford counsel an opportunity to confer with clients and other counsel to decide whether they wanted to move for recusal or request other action by the court." But, wrote the judge, though he intended to give counsel a full month in which to advise him of their clients' positions with respect to the disclosed matter—and, with this in mind, thought it sensible to summon only local counsel to the disclosure conference—he did not do so because, immediately following his revelation, both counsel, acting for their respective clients, spontaneously disclaimed any objection to his continued participation in the case.

On February 25, 1994, Cargill asked the district court to certify for interlocutory appeal the January 19 order denying the motion to dismiss. See 28 U.S.C. § 1292(b)

(1988).[3] Roughly two weeks later, Cargill moved for recusal, proffering several affidavits. Cargill's motion, like Wruble's letter of February 13, made it clear that Cargill's position rested on a supposed appearance of impropriety, that is, the existence of circumstances in which Cargill believed that the judge's impartiality might reasonably be questioned. See 28 U.S.C. § 455(a), quoted supra note 1. Cargill did not advance, then or now, any claim of actual bias. The plaintiffs opposed the recusal motion. In their opposition, they made two principal arguments: (1) Petruccelli's representation did not create an appearance of impropriety within the meaning of 28 U.S.C. § 455(a), and, in any event, (2) Cargill had waived any objection to the judge's continuing role in the case. The plaintiffs hinged the latter contention on 28 U.S.C. § 455(e), a statute that specifically permits a judge to accept the parties' waiver of a section 455(a) appearance-of-impropriety ground for disqualification as long as the waiver "is preceded by a full disclosure on the record of the basis for disqualification."

On May 12, 1994, the district court denied the recusal motion. Cargill subsequently filed its mandamus petition in this court. We invited the plaintiffs to respond, set a briefing schedule, and entertained oral argument.

## II. THE NATURE OF MANDAMUS

■ Federal appellate courts are empowered to issue prerogative writs that are "necessary or appropriate in aid of their respective jurisdictions" under the All Writs Act, 28 U.S.C. § 1651(a) (1988). Because such writs disrupt the mechanics of the judicial system—by accelerating appellate intervention, prerogative writs foster piecemeal review and disturb the historic relationship between trial and appellate courts—they should "be used stintingly and brought to bear only in extraordinary situations." Doughty v. Underwriters at Lloyd's, London, 6 F.3d 856, 865 (1st Cir.1993). Mandamus is such a writ. It is strong medicine, and should neither be prescribed casually nor dispensed freely.

---

**3.** The district court eventually denied this motion. Petitioner does not assign error to the

denial, nor could it rewardingly do so.

■ Consistent with these principles, the standards for issuance of the writ are high. A petitioner seeking mandamus must show both that there is a clear entitlement to the relief requested, and that irreparable harm will likely occur if the writ is withheld. *See United States v. Horn,* 29 F.3d 754, 769 (1st Cir.1994); *Doughty,* 6 F.3d at 866; *In re Pearson,* 990 F.2d 653, 657 & n. 4 (1st Cir. 1993). Sometimes, even these specific showings are not enough to justify a court's use of its mandamus power. In the final analysis, a writ of mandamus is an exceptional remedy and "is to be granted only in the exercise of sound discretion." *Whitehouse v. Illinois Cent. R. Co.,* 349 U.S. 366, 373, 75 S.Ct. 845, 850, 99 L.Ed. 1155 (1955). In this context, equity informs the court's discretion. *See Kerr v. United States Dist. Court,* 426 U.S. 394, 403, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976); *United States v. Helvering,* 301 U.S. 540, 543, 57 S.Ct. 855, 857, 81 L.Ed. 1272 (1937); *United States v. Dern,* 289 U.S. 352, 359, 53 S.Ct. 614, 617, 77 L.Ed. 1250 (1933); *Doughty,* 6 F.3d at 866; *United States v. Patterson,* 882 F.2d 595, 600 (1st Cir.1989), *cert. denied,* 493 U.S. 1027, 110 S.Ct. 737, 107 L.Ed.2d 755 (1990); *In re First Fed. Sav. & Loan Ass'n,* 860 F.2d 135, 139–40 (4th Cir. 1988); *Vishnevsky v. United States,* 581 F.2d 1249, 1255 (7th Cir.1978).

■ We have held that, in an appropriate case, an issue of judicial disqualification may present a sufficiently extraordinary situation to justify the unsheathing of our mandamus power. *See In re Allied–Signal, Inc.,* 891 F.2d 967, 969 (1st Cir.1989), *cert. denied,* 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 744 (1990); *In re Cooper,* 821 F.2d 833, 834 (1st Cir.1987); *In re United States,* 666 F.2d 690, 694 (1st Cir.1981); *see also In re Interna-*

*tional Business Mach. Corp.,* 618 F.2d 923, 927 (2d Cir.1980). However, the usual prerequisites to mandamus relief—a showing of both clear entitlement to the requested relief and irreparable harm without it, accompanied by a favorable balance of the equities—do not vanish merely because judicial disqualification is the business of the day. *See, e.g., Allied–Signal,* 891 F.2d at 969; *Cooper,* 821 F.2d at 834; *In re United States,* 666 F.2d at 694. In other words, the mere fact that a petition for mandamus is directed at securing the trial judge's removal does not ensure that the higher court will entertain the petition.

## III. DISCUSSION

After careful perscrutation of the record, we conclude that petitioner's quest for mandamus should go unrequited. Cargill has shown neither that it is clearly and indisputably entitled to the writ nor that it faces an intolerable risk of irreparable harm should it be forced to await appellate review in the ordinary course. Moreover, Cargill's failure to take timely action, after learning of the judge's disclosure and Maine counsel's ensuing waiver of objection, tips the equitable balance and argues persuasively against issuance of the writ.

### A

■ We turn first to the matter of entitlement to the relief requested. Assuming, *arguendo,* that the judge's relationship with Petruccelli created an appearance of impropriety adequate to animate section 455(a)—and we think that it probably did [4]—Cargill's entitlement to an order of disqualification remains questionable. Regardless of wheth-

4. The disqualification requirement of section 455(a) is triggered, despite the lack of any actual bias on the judge's part, if a reasonable person, knowing all the circumstances, would question the judge's impartiality. *See Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 861–62, 108 S.Ct. 2194, 2203–04, 100 L.Ed.2d 855 (1988). Most observers would agree that a judge should not hear a case argued by an attorney who, at the same time, is representing the judge in a personal matter. *See* 13A Charles Wright, Arthur Miller & Edward Cooper, *Federal Practice and Procedure* § 3549, at 614 (1984) (citing cases). Although the appearance of partiality is attenuated when the lawyer appearing before the judge is a member of the same law firm as the judge's personal counsel, but not the same individual, many of the same cautionary factors are still in play. *See, e.g.,* 2 Administrative Office of the U.S. Courts, *Guide to Judiciary Policies and Procedures* V–32 (1995) (expressing the view that "where an attorney-client relationship exists between the judge and the lawyer whose law firm appears in the case, the judge should recuse absent remittal"). This principle would seem to have particular force where, as here, the law firm is small and the judge's lawyer is a name partner.

er the actions of its local counsel effected a fully valid waiver of the disqualifying circumstance, the silence of Cargill and its lead counsel after learning what had transpired may very well have added the missing element, ratified the waiver, and given it life. We elucidate below.

The relevant statute, 28 U.S.C. § 455(e), plainly contemplates that a party may waive an appearance-of-impropriety ground for disqualification. The statute itself does not define the form or prerequisites of such a waiver; it only imposes the condition that the waiver be "preceded by a full disclosure on the record of the basis for disqualification." 28 U.S.C. § 455(e). The transcript of the January 12 conference leaves no doubt that such a disclosure occurred. The judge laid out the nature of his relationship with Petruccelli, citing book and verse. This disclosure was then followed by an unequivocal statement on the part of Cargill's counsel, unprompted by the court, to the effect that Cargill did not object to the judge's continued service in the case. Local counsel reported these developments to lead counsel immediately after the conference ended, and Verner, Liipfert in turn promptly informed the client. Yet, for nearly a month thereafter, Cargill failed to express any discomfiture with the waiver.

Although we leave the ultimate question open for resolution on an end-of-case appeal, we think that local counsel's unqualified assent, combined with Cargill's subsequent silence for a substantial period of time, creates a sturdy foundation on which the validity of the waiver might rest, and that the resultant uncertainty undercuts Cargill's claim that it is plainly entitled to the requested relief. After all, it is common ground that civil litigants ordinarily are bound by their attor-

neys' tactical judgments, see, e.g., Brody v. President & Fellows of Harvard Coll., 664 F.2d 10, 12 (1st Cir.1981) (holding, on particular facts, that client would not be allowed "to second guess his attorney's waiver"), cert. denied, 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982), and waivers based on silence are standard fare, see, e.g., United States v. Nobel, 696 F.2d 231, 237 (3d Cir. 1982) (finding waiver under § 455(e) based on party's failure to make a timely objection once the basis for disqualification was fully disclosed), cert. denied, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983).

However, Cargill asseverates that no valid waiver could be given by its Maine counsel because the judge failed to follow exactly the procedures governing waivers of disqualification dictated by the Code of Conduct for United States Judges (CCUSJ), adopted by the Judicial Conference of the United States following promulgation by the American Bar Association. See CCUSJ, reprinted in 150 F.R.D. 307 (1992). Canon 3D of the CCUSJ allows a judge to hear a case if the parties and their lawyers agree to the judge's continued service not only after disclosure of certain bases for disqualification (including appearance of impropriety), but also after having been afforded "an opportunity to confer outside the presence of the judge[.]" Id. at 313. Here, what transpired at the disclosure conference met the first requirement of Canon 3D, but not the second.

However, even if we assume arguendo that this noncompliance rendered the original waiver ineffective,[5] counsel thereafter had ample opportunity for consultation with the client, outside the presence of the judge, yet Cargill, knowing of the stated waiver, did not alter its position. When the judge's departure from the CCUSJ is weighed in the

---

**5.** Although we need not decide the point, we doubt that every instance of noncompliance with the CCUSJ automatically justifies post-hoc invalidation of a waiver that otherwise meets the test of section 455(e). Certainly, the case law on the point is less than transpicuously clear. See, e.g., Nobel, 696 F.2d at 237 (explaining that "it is sufficient under [section 455(e)] if the judge provides full disclosure of his or her relationship at a time early enough to form the basis of a timely motion at or before trial and under circumstances which avoid any subtle coercion"); Haire

v. Cook, 237 Ga. 639, 229 S.E.2d 436, 438–39 (1976) (similar; construing Georgia law); Commonwealth v. Keigney, 3 Mass.App.Ct. 347, 329 N.E.2d 778, 781 (1975) (Goodman, J., concurring) (similar; construing Massachusetts law). Notwithstanding the importance we attach to the CCUSJ and the obvious desirability of assuring judicial compliance with the canons, we think a strong argument can be made that not all instances of noncompliance with the CCUSJ are automatic disqualifiers.

balance along with his explanation and Cargill's knowing acquiescence in local counsel's express waiver, the call seems to us to be quite close. This closeness sets a chain reaction in motion. It leads us first to conclude that the contested waiver may well be enforceable, and constitutes, at the least, a potential stumbling block on the road to recusal. The first conclusion leads inexorably to a second conclusion: that petitioner has failed in its endeavor to demonstrate that it is "clearly and indisputably" entitled to the relief that it seeks.

To be sure, Cargill has attempted to explain away its apparent ratification of the position taken by its local counsel both factually (through a series of affidavits) and legally (through its insistence on literal compliance with Canon 3D). Its factual explanations and legal theories may or may not hold water in the long run, but that is scarcely the point. We need not—and do not—decide the merits of the waiver question at this juncture. It suffices for present purposes merely to note that the issue is sufficiently clouded that petitioner's eventual entitlement to the requested redress—the district judge's recusal—is problematic.[6] *See Pearson*, 990 F.2d at 656 & n. 4; *Cooper*, 821 F.2d at 834.

### B

Petitioner suggests that recusal of a judge presents a special circumstance which, even in the absence of clear entitlement to the requested relief, warrants interlocutory review by way of mandamus. This suggestion is not without force.[7] In cases in which parties have sought recusal based on assertions of actual bias, we have stated that "the issue of judicial disqualification presents an

extraordinary situation suitable for the exercise of our mandamus jurisdiction." *In re United States*, 666 F.2d at 694.

Our rationale in these cases has been that "[p]ublic confidence in the courts may require that such a question be disposed of at the earliest possible opportunity." *In re Union Leader Corp.*, 292 F.2d 381, 384 (1st Cir.), *cert. denied*, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961). However, we have cautioned that this philosophy does not "commit us to entertaining every rejected affidavit of prejudice," and we have made it clear that, even when a mandamus petition seeks a judge's recusal based on an assertion of actual bias, mandamus remains "a discretionary writ." *Id.* Because its origins are equitable in nature, the writ should issue to remedy a wrong, not to promote one—and it should not "be granted in aid of those who do not come into court with clean hands." *United States v. Fisher*, 222 U.S. 204, 209 (1911).

In this case, principles of equity caution against exercising discretion to reach out for the disqualification issue here and now. To explain why, we must remind the reader that mandamus is a potent weapon. Precisely because the writ packs a considerable wallop, litigants are sometimes tempted to employ it for its strategic value, regardless of the merits of their cause. *See Allied–Signal*, 891 F.2d at 970; *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312–16 (2d Cir.1988), *cert. denied*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). Ignoring this possibility when, as now, a petition for mandamus seeks the disqualification of a judge shortly after the judge decides a major point against the petitioner would be to blink reality. In the real world, recusal motions are

---

6. Because we find no clear and indisputable entitlement to the requested relief, we need not consider whether Cargill satisfied the second prong of the mandamus test by a showing of irreparable harm. We note, however, that although there is always some harm in litigating for nought, that harm repeatedly has been held insufficient, in itself, to justify mandamus relief. *See, e.g., In re Bushkin Assocs.*, 864 F.2d 241, 243–44 (1st Cir.1989).

7. In the same vein, however, we can envision cases in which, despite a showing that ordinarily would amount to clear entitlement, a litigant has acted so deplorably that the petitioned court

might choose to withhold discretionary relief. *See generally Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945) (explaining that the doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief"); *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 880 (1st Cir.1995) ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands.").

sometimes driven more by litigation strategies than by ethical concerns.

In such straitened circumstances, appellate tribunals must be especially alert to the dangers of manipulation. Courts can ill afford to permit mandamus to be used as a tactic to jettison an impartial judge whose slant on a case, as evidenced by his rulings, jeopardizes a party's chances for ultimate success. *See In re United Shoe Mach. Corp.*, 276 F.2d 77, 79 (1st Cir.1960) ("We cannot permit a litigant to test the mind of the trial judge like a boy testing the temperature of the water in the pool with his toe, and if found to his liking, decides to take a plunge.") (citation and internal quotation marks omitted); *cf. Reilly v. United States*, 863 F.2d 149, 160 (1st Cir.1988) (explaining that "when a trial judge announces a proposed course of action which litigants believe to be erroneous, the parties detrimentally affected must act expeditiously to call the error to the judge's attention or to cure the defect, not lurk in the bushes waiting to ask for another trial when their litigatory milk curdles"). By like token, courts cannot afford to spawn a public perception that lawyers and litigants will benefit by undertaking such machinations.

This case runs up just such a red flag. While the record does not compel a finding that petitioner and its lead attorneys delayed any attempt to retract Maine counsel's waiver as part of a plot to await the results of the judge's impending decision, the chronology is suggestive. The scenario lends itself to the following description: Cargill, armed with all the relevant facts no later than January 14 and knowing that the judge planned to decide the key motion in the case during the following week,[8] held its "appearance-of-impropriety" and "invalid waiver" arguments in reserve, deferred any recusal initiative, awaited the ruling on the motion to dismiss, found that ruling to be greatly disappointing, and then pulled the recusal option off the

shelf in hopes of locating a more sympathetic trier.

Of course, Verner, Liipfert tries strenuously to explain away this chain of events. The firm's attorneys have regaled us with descriptions of both their busy travel schedules and the inclement weather that struck the nation's capitol during January of 1994. But even if we were to take these excuses at face value, they are simply not sufficient to justify the firm's decision to sit silently by until the judge had showed his hand.

We believe it is self-evident that, once Cargill was aware of the details surrounding Petruccelli's relationship with the judge, it should at a bare minimum have told the court that it wanted time to rethink its options and sought a delay in the issuance of the court's opinion (which it knew to be imminent). In all probability, it would have taken no more than a telephone call or a facsimile transmission to place matters on hold.[9] Thus, putting the most favorable face on the situation, it is apparent that Cargill and its lead counsel neglected to act with the immediacy that the circumstances obviously required.

Our need to exercise discretion also demands that we take a related point into account. The case at hand is different than our earlier precedents in several respects. First, it does not involve a claim of actual bias, and, thus, it lacks one important ingredient that in the past often prompted us to undertake review of judicial disqualification orders at the earliest practicable time. *See Union Leader*, 292 F.2d at 384. When issuing the writ is necessary to promote public confidence in the courts by avoiding the unseemly spectacle of trial before a biased judge, the need for immediate relief is manifest. *See In re United States*, 666 F.2d at 694. These concerns are lessened where, as here, there is neither a trace nor a sugges-

---

8. The various affidavits submitted *by the petitioner* to the district court establish that on Wednesday, January 12, the very day that the disclosure conference was held, Pierce, Atwood informed Verner, Liipfert of what had transpired, including the judge's plan to issue his decision in approximately one week. A corporate official was told of the situation no later than Friday, January 14.

9. Cargill suggests that it might have offended the judge by taking such action. We think its concerns are overblown: lawyers run such a risk every time they seek a judge's recusal. In any event, trial advocacy is no sport for the timorous.

tion of actual bias. Second, in this case, the party who now claims to be aggrieved earlier had made an express waiver of the stated ground for disqualification. This, too, changes the calculus of public perception.

Last, but far from least, petitioner's course of conduct—whether conniving or merely slipshod—influences our assessment of the equities. Its handling of the matter places us between Scylla and Charybdis: if we do not entertain the petition, we run a risk of seeming hesitant to inquire too deeply into a possible abuse of judicial power; yet, if we entertain the petition despite the appearance of sandbagging that Cargill has created, we run a risk of eroding public confidence in the courts by seeming to reward a litigant for its gamesmanship.

Given the fundamental nature of mandamus, declining jurisdiction in the exercise of our informed discretion seems preferable. Though it might be mere coincidence that the delay in seeking to set aside the waiver worked to Cargill's advantage by allowing it to see which way the wind was blowing before deciding whether to urge recusal, the appearance of judge-shopping is sufficiently pronounced that the equities counsel restraint. *See, e.g., Apple v. Jewish Hosp. & Medical Ctr.,* 829 F.2d 326, 334 (2d Cir.1987) (noting that a "movant may not hold back and wait, hedging its bets against the eventual outcome"); *Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1472 (11th Cir.1986) ("Counsel, knowing the facts claimed to support a § 455(a) recusal for appearance of partiality may not lie in wait, raising the recusal issue only after learning of the court's ruling on the merits."), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987). We simply cannot afford to nourish the impression that the courts, as an institution, will bend over backward, overlook the obvious, and countenance sharp tactics merely because they are directed at a judge.

## IV. CONCLUSION

We need go no further. Petitioner has neither met the conventional requirements for mandamus relief nor satisfied us that, in the unique circumstances of this case, the equities favor an affirmative exercise of our discretion. Consequently, we deny the petition, without prejudice to Cargill's right to raise its claim of error, if it so chooses, in an end-of-case appeal.[10]

***The petition for a writ of mandamus is denied.***

—Appendix follows; dissenting opinion follows appendix—

## APPENDIX

## CHAMBERS CONFERENCE

### January 12, 1994

**THE COURT:** This is a very simple matter, I think. At least the reason for the conference, so you don't have to get all excited about it, is because Mr. Bates is counsel in this matter and I have a disclosure that I must make to counsel.

Approximately on December 19th, 1993, while Mrs. Carter and I were in the course of looking for a new house, I got in a controversy with a party in a contract, a purchase and sale, a minor controversy.

I, on that date, called Gerald Petruccelli, Mr. Bates's partner, and I asked him if he could give me advice and perhaps represent me if it came to that.

He called me back on December 20th and said that he had decided there was no

---

**10.** Just as orders disqualifying or refusing to disqualify counsel "can be reviewed as effectively on appeal of a final judgment as on an interlocutory appeal," *Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 438, 105 S.Ct. 2757, 2765, 86 L.Ed.2d 340 (1985), we see no reason why orders pertaining to judicial disqualification cannot be effectively reviewed at that time and in that manner. Nor is this scenario oddly configured. An end-of-case appeal is a matter of right, while mandamus is a matter of discretion. Courts have frequently found that difference dispositive in analogous circumstances. *See, e.g., Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 34, 101 S.Ct. 188, 189–90, 66 L.Ed.2d 193 (1980) (per curiam); *In re Bushkin Assocs.,* 864 F.2d 241, 244 (1st Cir.1989). And, moreover, the fact that a lengthy trial has intervened will not rob an appeal of its effectiveness. *See, e.g., Stauble v. Warrob, Inc.,* 977 F.2d 690 (1st Cir.1992) (vacating judgment on direct appeal following 35–day trial, despite the circuit court's earlier denial of mandamus relief on the same ground).

impediment to this representation of me. I met with him on December 21 for about 45 to 50 minutes, we discussed the matter. I told him that I wanted a quick resolution—I should practice what I preach.

I had telephone conferences with him about the matter on December 22, 23, 28 and 29, four or five minutes a piece. I understand from him that he had telephone conferences during that period of time with another attorney and on January 6th, 1994, the matter was resolved to my satisfaction. On the 7th, Mr. Petruccelli rendered to me his bill and on the 10th, that bill was paid in full.

The understanding at the conference that I had with him on the 21st of December was that I would pay the usual rate, usual fee computed at the usual hourly rate for the hours of devotion to the case that he would charge to any stranger off the street. And I was very serious about that, and I'm sure that he was and I think the bill was entirely satisfactory one to me, and I have no reason to expect that it is to him. So we have no kind of debt of any kind to each other out of this very brief transaction.

I will tell you that I am morally certain in my own mind that this series of events will not in any way affect my ability in the way I would find it to be properly decided, even if the event had not occurred.

However, under the code, the canons of judicial conduct, I felt arguably perhaps, but I felt that it was proper, perhaps required, but at least proper that I disclose it and see if anyone has any objection in my continuing to serve as the judge who will ultimately decide this case.

**MR. BATES:** Speaking for the plaintiff, we have absolutely no objection.

**THE COURT:** The record should also reflect that I never had any conversation with Mr. Bates or anyone else of Mr. Petruccelli's office.

**MR. O'LEARY:** Speaking for the defense, there is no objection.

**THE COURT:** I wanted you to know this. That's all I have. We have been for some time—I have been in the course of dealing with motions which raise some very interesting and difficult questions and I expect that within a week or so I will be in a position to file a decision resolving that, so the matter can go forward. I apologize having held the matter up that long but these are very tough things, not matters of first impression, and I don't have a lot of guidance by better judges than I.

**MR. O'LEARY:** Thank you.

**MR. BATES:** We appreciate it.

**THE COURT:** Thank you very much. Another matter, the Graffam, matter, is scheduled for trial, which is in your office on the other side, you might just talk with them about it, Bill Kayatta, apprise him of what has happened and tell him that matter is also scheduled for conference for the same purpose so he can have a chance to reflect on it.

**MR. BATES:** I don't know that this needs to be a part of the record. I know that Gerry told me that he was going to call Bill Kayatta, and did so.

**THE COURT:** Gerry did call and tell me that he had called someone to see if that would create, if his representation would create any problem and I didn't know what case it was about or who the lawyer was. Ultimately he called me back and told me that he had found no impediment to his representation.

**MR. O'LEARY:** I appreciate the disclosure.

[End of conference]

CAMPBELL, Senior Circuit Judge, (dissenting).

While the question is exceedingly close, I regret that I cannot agree with the court. The court's opinion would be persuasive if written before the Judicial Conference of the United States had adopted Canon 3D of the *Code of Conduct for United States Judges.* But the court's opinion seems to me to pay too little attention to the district court's failure to have observed the Canon. Canon 3D provides,

A judge disqualified by the terms of Canon 3C(1), except in the circumstances specifically set out in subsections (a) through (e) may, instead of withdrawing from the pro-

ceeding, disclose on the record the basis of disqualification. *If the parties and their lawyers after such disclosure and an opportunity to confer outside of the presence of the judge,* all agree in writing or on the record that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceeding. The agreement shall be incorporated in the record of the proceeding. (emphasis added).

Canon 3D applies squarely to the situation here, in which a judge has sought the parties' waiver of his mandatory disqualification under § 455(a). Congress expressly allows a judge to accept a waiver of his disqualification under § 455(a) (appearance of lack of impartiality) although not under § 455(b) (bias, personal knowledge of facts, financial interest, etc.). *See* 28 U.S.C. § 455(e). But while § 455(e) specifies no more than that such waiver be preceded "by a full disclosure on the record of the basis for disqualification," the judiciary is also subject to its own Canon 3D which imposes additional conditions that were not followed here. For that reason, I disagree that the parties ever effectively waived the duty imposed by § 455(a) that the judge disqualify himself.

I make two points at the outset. First, as my colleagues seem to concede, the judge's employment, as his own lawyer, of the senior partner of the law firm representing plaintiffs at the time he was considering a major dispositive motion in plaintiffs' lawsuit, gave rise to a reasonable question of his impartiality under § 455(a). While this was hardly a major indiscretion as such matters go, it was the kind of conduct that gives rise to an appearance of impropriety. Our court is in apparent agreement as to the applicability of § 455(a). However, because the district court felt otherwise, and because the issue deserves consideration, I have stated my reasons for finding that § 455(a) applies in an appendix to this dissent. Section 455(a) required the judge to disqualify himself sua sponte unless he received and accepted an appropriate waiver from the parties.

A second point is that the proceedings at the January 12 conference—at which the judge candidly and commendably disclosed the matter—omitted to follow Canon 3D in basic ways. Canon 3D was developed to offset the criticism that otherwise disqualified judges sometimes secured the parties' agreement to allow them to continue in cases by taking advantage of counsel's natural reluctance to offend a judge before whom they frequently had to appear. The original language of Canon 3D was drafted by a special committee of the American Bar Association chaired by the former chief justice of the Supreme Court of California, Justice Traynor. Justice Traynor emphasized that, before a valid waiver could occur, counsel must receive an opportunity to confer with their clients outside the judge's presence. The special committee also believed that the client as well as counsel had to be involved in the waiver decision, as the "parties are less likely than counsel to feel judicial pressure [to remain in the case]...." *Broadening and Clarifying the Grounds for Judicial Disqualification: Hearing on S. 1064 Before the Subcomm. of Courts, Civil Liberties and the Administrative Justice of the House Comm. on the Judiciary,* 93d Cong., 2d Sess. (1974).

The Canon serves in part to dispel counsel's sense that by failing immediately to endorse the judge's continued presence in the case, counsel might annoy the judge and prejudice their cause. Under the Canon, counsel must be extended an opportunity to consider the disqualification issue outside the judge's presence, hence free from the fear that any hesitancy to endorse the judge's continued presence may be personally held against him.

In the present case, the judge never stated that local counsel was free to withdraw and discuss disqualification with his client and co-counsel. The judge knew or should have known at this time that counsel had no prior opportunity to discuss the issue with his client. The judge had not disclosed the subject of the conference in advance. Local counsel had made express inquiry the day previous as to what the January 12 meeting would be about and could learn nothing. Counsel, therefore, could not have discussed the issue with his client and lead counsel *prior* to the meeting. When he came to the

conference, local counsel had to react on the spur of the moment, without knowing what rights the judge was prepared to recognize, without knowing whether the judge would recuse himself if counsel objected, and without reassurance from the court that, without offense, local counsel would be given a chance to consider this matter with his client outside of the court's presence. The express language of the Canon, conditioning a waiver upon an opportunity to confer with the parties and counsel outside the judge's presence, was not, in these circumstances, put into play.

In hindsight, to be sure, local counsel could have sought to save the situation by requesting time to talk to lead counsel and his client—a request the judge indicates he would have granted. However, without the judge's advance advice, counsel would not necessarily be expected to know of his rights under Canon 3D, or indeed to know that Canon 3D existed at all. Moreover, counsel may have felt that, where the judge stated that the disclosed conduct would not affect his ability to decide the case, and indicated no clear willingness to withdraw, any hesitancy would simply be an irritant. The duty to extend the benefits of this Canon to the parties rests upon the judge. Here the judge did not mention the provisions of the Canon nor indicate what rights he would recognize.

In such circumstances, I think it plain that no waiver occurred on January 12. In fact, the scenario at the January 12 conference was exactly the one that Canon 3D was intended to change. The drafters of Canon 3D thought that a judge who simply announced disqualifying facts, indicated his desire to continue to serve, and solicited and accepted oral waivers from the attorneys present, might be exercising a "velvet blackjack." *Broadening and Clarifying the Grounds for Judicial Disqualification: Hearing on S. 1064 Before the Subcomm. of Courts, Civil Liberties and the Administrative Justice of the House Comm. on the Judiciary*, 93d Cong., 2d Sess. (1974). Canon 3D, by requiring discussion with the clients outside the judge's presence and, by requiring the clients' acquiescence as well as

that of counsel, sought to ease the pressures to acquiesce that inhered in the "old" process.

It is true that the Code of Judicial Conduct is not statutory, nor does the Judicial Conference of the United States which adopted the Code hold a specific statutory grant of authority to enact binding ethical rules. However, the Conference is itself a creature of statute. *See* 28 U.S.C. § 331. Chaired by the Chief Justice, the Conference is the one body recognized as speaking administratively for the entire federal judiciary. Its adoption of Canon 3D, I suggest, gives the Canon great persuasive weight. Additionally, the provisions of Canon 3D emanated from a model ethical code drafted by the American Bar Association and adopted in one or another version, by many states. It is important, I think, to our institutional credibility, that the procedures set out in Canon 3D of the Code of Conduct for United States Judges be taken seriously.

As, in my view, no waiver occurred by force of local counsel's acquiescence on January 12, the question arises whether some kind of de facto waiver or equitable bar should be implied from Cargill's failure to object promptly to the judge's continued participation once its local counsel had told it of the judge's disclosures. Cargill also learned at the January 12 conference that the judge was about to hand down his ruling. If Cargill did not want the judge to participate, my colleagues believe that Cargill was required to protest then and there, rather than strategically waiting to see how the wind blew, objecting—as it did—only after the judge had ruled against it.

This is a close question. There is certainly weight to my colleagues' view that Cargill may be misusing the Canon now for purely strategic purposes. It can be implied, moreover, that the district court having fully revealed the conduct in question, sincerely, if incorrectly under the Canon, relied on local counsel's approval, not withdrawn, as sanctioning the court's continuance in the case. But while reasonable minds may differ, I believe that the court's failure to follow Canon 3D's waiver procedures so clouded future events as to make it inappropriate to read

too much into Cargill's failure to challenge the judge's continued participation during the week prior to the court's ruling on the motion. A primary purpose of the procedure outlined in the Canon is to remove, or at least to lessen, the pressure of the judge's feared resentment if a waiver is not quickly volunteered. This lessening of pressure would not have happened here. The Canon anticipates that the court will reassure attorneys in advance of their right to speak to their clients out of the judge's presence. Also that the judge will inform counsel that he will withdraw if waiver is not granted, or, at least, of his intentions in this regard. In the present case, by the time Cargill learned of the judge's stated grounds for disqualification, the judge had already made the decision not to recuse himself. At that point, Cargill had no assurance that its repudiation of local counsel's acquiescence would be honored. It had to decide whether to risk angering the judge futilely at a time when the matter seemed to have been settled and a decision on its motion was imminent.

To be sure, Cargill's local counsel could have acted differently. It is often true—and properly so—that a client is bound by positions taken or not taken by his attorney. Canon 3D makes it clear, however, that attorney acquiescence, standing alone, is not enough to constitute a waiver. Local counsel's acquiescence followed by Cargill's reluctance to object cannot be disassociated from the judge's initial failure to implement the Canon provision—a provision that the judge himself is responsible for explaining and implementing in the first instance. Canon 3D, setting out the requirements for a judge to secure a valid waiver of his own disqualification, is not mere grist for the adversarial mill. Rather, it is a rule of conduct the judge is supposed to know and apply. While Cargill's counsel might have saved the situation, responsibility for the error should not too easily be shifted to the shoulders of one of the parties. Given the altered situation confronting Cargill once the die had been cast on January 12, I am not disposed to find that Cargill ratified local counsel's earlier acquiescence simply by taking no action before the court's decision.

Cargill, to be sure, had to act diligently if it wished to challenge the judge. Delay would soon become unfair to Cargill's opponent, who would continue to invest money and effort into the lawsuit in reliance upon the continued service of the judge in question. But Cargill's raising of an objection within a month after the decision seems to me to be acceptable given that the initial error was that of the judge, not Cargill. In so saying, I recognize the validity of my colleagues' concern that Cargill may well be acting strategically, and that courts are, and should be, reluctant to allow two bites at the apple. But against this must be weighed the nonobservance of Canon 3D.

As § 455(a) applied and, in my view, no sufficient waiver occurred under § 455(e), the question of remedy arises. In *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 862–64, 108 S.Ct. 2194, 2203–05, 100 L.Ed.2d 855 (1988), the Supreme Court wrote:

> A conclusion that a [§ 455(a)] violation occurred does not, however, end our inquiry. As in other areas of the law, there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance. There need not be a draconian remedy for every violation of § 455(a).... We conclude that in determining whether a judgment should be vacated for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

*See also In re Allied–Signal, Inc.*, 891 F.2d 974, 975–76 (1st Cir.1989).

For a new judge to be brought in at this juncture would not, in my view, be a draconian remedy, nor a license for unwarranted attacks on courts. To be sure, the question that arose here—the judge's brief use of the senior law partner in the same law firm retained by plaintiffs—was not monumental and quite likely would have been waived by Cargill in a proper proceeding. Moreover, evidencing his integrity, the judge quickly called a conference and revealed all the rele-

vant facts. Nonetheless, the judge's retention of Mr. Petruccelli at the time of the pending lawsuit did create the appearance of lack of impartiality; and section 455(a) required the judge to step aside unless he received proper waivers from the parties. As this did not occur here, and as the case is still at an early stage, I think it would be reasonable for another judge to enter the case. While this imposes some small price on the court and plaintiffs, it is justified as demonstrating the need to observe the Canon.

I would add that, had mandamus requiring a new judge been granted, it would have been open to this court to let stand the former judge's ruling on Cargill's dismissal motion. Whether to do this would have been a close question, but, however that issue were resolved, the bringing in of a new judge would have emphasized that Canon 3D procedures are not precatory.

I do not take too seriously my colleagues' suggestion that this issue may be revisited several years down the road on direct appeal from any final judgment rendered in plaintiffs' favor. By then there would be overwhelming equities in plaintiffs' favor *not* to require them to undergo the expense and burden of retrying the case before a different judge. The Supreme Court has stated "that in determining whether a judgment should be vacated for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties." *Liljeberg*, 486 U.S. at 864, 108 S.Ct. at 2205. Mandamus has been properly recognized as the usual and proper remedy for raising and resolving promptly a question of judicial disqualification such as this. *See, e.g., Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 163 (3d Cir.1993); *In re United States*, 666 F.2d 690, 694 (1st Cir.1981). I would expect that the court's decision, which has been rendered after the most careful consideration by all members of the panel, will end the matter.

### Appendix to Judge Campbell's Dissent

For the following reasons, I conclude that the judge's relationship with Mr. Petruccelli

required him to recuse himself under 28 U.S.C. § 455(a) absent receipt of the parties' waiver. That statute provides that a judge "*shall* disqualify himself in any proceeding in which his impartiality *might reasonably* be questioned." (emphasis supplied). The legislative history indicates that section 455(a) was meant to lessen the traditional "duty to sit," and, as the Supreme Court has indicated, to require avoidance of even the appearance of partiality. *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 860–61, 108 S.Ct. 2194, 2202–03, 100 L.Ed.2d 855 (1988). Recusal may be required even in the absence of actual partiality if there is an objectively reasonable basis for doubting the judge's impartiality. *Id.; see Code of Judicial Conduct* Canon 2 (1973) ("[A] judge should avoid impropriety and *the appearance of* impropriety in all his activities.") (emphasis supplied). The Committee on the Codes and Conduct of the Judicial Conference of the United States stated that

> where an attorney-client relationship exists between the judge and the lawyer whose law firm appears in the case, the judge should recuse absent remittal.

2 Administrative Office of the U.S. Courts, *Guide to Judiciary Policies and Procedures* V–25 (1993).

The proper standard for ascertaining whether a judge's impartiality might reasonably be questioned under § 455(a) is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt, not in the mind of the judge, or even necessarily that of the litigant, but rather in the mind of the reasonable person. *See United States v. Cowden*, 545 F.2d 257, 265 (1st Cir.1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). Section 455(a) requires a contextual, case-by-case analysis. It does not imply a bright-line rule disqualifying any judge who ever has personal dealings with an attorney whose firm represents litigants before the same judge. The existing case law on the subject of judge-attorney dealings rests on exceedingly fact-specific judgments, with different outcomes in different situations.[11]

---

**11.** *See In re Placid Oil Co.*, 802 F.2d 783 (5th Cir.1986); *Potashnick v. Port City Constr. Co.*,

Having said this, certain principles seem clear. A judge would ordinarily be disqualified to sit by § 455(a) if an attorney in the case before him or her were, at the same time, actively representing the judge in a personal matter. *See* 13A Charles Wright, Arthur Miller & Edward Cooper, *Federal Practice and Procedure* § 3549 at 614 (1984); *cf. Potashnick,* 609 F.2d at 1110–12; *Texaco,* 354 F.2d at 657. And while the situation is more attenuated where the judge is being personally represented not by the same attorney but by someone else in the attorney's firm, the latter situation is at least cause for concern, as there can be no doubt that, in many factual situations, such overlap can create the appearance of partiality calling for withdrawal under § 455(a). The members of the Judicial Conference Committee advising judges as to the proper interpretation of the Code of Conduct have said as much. *See* 2 *Guide to Judiciary Policies and Procedures, supra,* at V–25.

Weighing all the factors in the present case—in which I entertain no doubt whatsoever as to the judge's personal integrity—I nonetheless believe that a reasonable person viewing all the circumstances might have questioned the impartiality of the judge. The judge's ruling to the contrary was, I believe, an abuse of discretion. *See In re United States,* 666 F.2d 690, 697 (1st Cir. 1981) (a federal judge's decision on whether to recuse himself or herself is committed to that judge's sound discretion).

The judge received personal legal services from the senior partner of Petruccelli & Martin, a small eight-member firm, close to the time the court ruled upon a dismissal motion that, had it been resolved for Cargill, would have put Petruccelli & Martin's client out of court. The problem is not simply that by personally retaining Mr. Petruccelli, the judge indicated he had high regard for the latter's professional abilities. Judges may and often do, with propriety, indicate respect for an attorney's competence. Here, however, by retaining the senior partner of this small firm for personal legal advice while having under advisement a dispositive motion in a case being handled by other members of the firm, the court gave the appearance that he may have had a particular affinity for that firm and perhaps some close and special relationship. Other attorneys in the same case could reasonably have been offended by what might have appeared, from the outside, to have been a confidential relationship between the judge and Mr. Petruccelli at that particular time. Also, even after the ending of the judge's own attorney-client relationship, an outside observer might wonder if, in some manner, consciously or unconsciously, the judge's appreciation for a job well done by plaintiff's law firm might possibly affect his handling of the pending case.

The judge's brief attorney-client relationship with Mr. Petruccelli ended, it is true, before the judge's decision in the case against Cargill. The judge, however, had worked on Cargill's motion during the period of that relationship. Moreover, the relationship ended only ten days before the decision—a period too short to insulate the two events from one another. Any appearance of partiality that existed prior to the time the representation ceased cannot be meaningfully separated from the court's decision of January 19.

It is important to emphasize that 28 U.S.C. § 455(a) is concerned with the *appearance* of impartiality. *Liljeberg,* 486 U.S. at 860–61, 108 S.Ct. at 2202–03. Disqualification for *actual* personal bias or prejudice is separately covered by § 455(b)(1). The judge seems

609 F.2d 1101 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *Texaco v. Chandler,* 354 F.2d 655 (10th Cir.1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1066, 15 L.Ed.2d 853 (1966); *Rapp v. Van Dusen,* 350 F.2d 806 (3d Cir.1965); *In re Snowshoe Co.,* 137 B.R. 619 (D.W.Va.1991), *aff'd mem.,* 953 F.2d 639 (4th Cir.1992); *Carbana v. Cruz,* 595 F.Supp. 585 (D.P.R.1984), *aff'd mem.,* 767 F.2d 905 (1st Cir. 1985); *Miller Indus., Inc. v. Caterpillar Tractor Co.,* 516 F.Supp. 84 (D.Ala.1980); *Smith v. Sikorsky Aircraft,* 420 F.Supp. 661 (C.D.Cal.1976). *See also Varela v. Jones,* 746 F.2d 1413 (10th Cir.1984); *S.J. Groves & Sons Co. v. I.B.T.,* 581 F.2d 1241 (7th Cir.1978); *United States v. Equifax, Inc.,* 557 F.2d 456 (5th Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *In re Georgetown Park Apt.,* 143 B.R. 557 (9th Cir. BAP 1992). *Cf. In re Allied–Signal, Inc.,* 891 F.2d 974 (1st Cir.1989).

to have overlooked the appearance aspect of the statute when he emphasized at the January 12 conference his moral certainty that his handling of the case would not be affected by the relationship with Mr. Petruccelli. The question was not just whether he was biased or prejudiced, but whether his impartiality might reasonably be questioned, a related but different matter.[12] According to the House Report accompanying amendments to § 455,

> Subsection (a) of the amended section 455 contains the general, or catch-all, [of Canon 3C] that a judge shall disqualify himself in any proceeding in which 'his impartiality' might reasonably be questioned. This sets up an objective standard, rather than the subjective standard set forth in the existing statute.... This general standard is designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case. The language also has the effect of removing the so-called 'duty to sit' which has become a gloss on the existing statute....

H.Rep. No. 93–1453, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6354–6355.

To be sure, the drafters of the statute were also concerned, as are my colleagues here, that the statute not be used by litigants for purely strategic purposes. The House Report cautions that the new test should not be used by judges to avoid sitting in difficult or controversial cases. Disqualification for lack of impartiality must always have "a *reasonable* basis." *Id.* (emphasis in original).

Yet the question at issue is, *objectively,* whether the circumstances reasonably gave rise to a question of the judge's impartiality. If so, the judge *shall* disqualify himself. An express purpose of the 1974 rewrite of § 455 was to abandon the subjective standard of the older statute, which had depended largely on the judge's personal view of whether he or she could behave impartially. Unfortunately, the circumstances here created a situation where a reasonable observer could entertain doubts as to the judge's impartiality. The judge himself obviously had concerns about the appearance of what had happened, leading him to call the conference of January 12 for the purpose of disclosing what had transpired.

That a question of the judge's impartiality under § 455(a) existed does not mean that the judge committed a serious impropriety. The judge explained that he did not immediately focus on the fact that Mr. Petruccelli's firm, partners and associates were involved in the case pending before him. Once aware, the judge commendably disclosed the relationship. This action speaks loudly as to the judge's personal integrity. The fact remains, however, that a reasonable observer could objectively question the judge's impartiality in the particular circumstances. The judge was, therefore, required to remove himself unless he had received the parties' waiver.

---

**12.** Section 455 was completely rewritten by Congress in 1974 so as to conform with the then-new *Code of Judicial Conduct* which the Judicial Conference of the United States had adopted in 1973 as being applicable to all federal judges. Section 455 was amended so as nearly to duplicate the Code's Canon 3C, with the intention that federal judges "would no longer be subject to dual [i.e.] Code and statutory standards governing their qualification to sit in a particular proceeding." H.Rep. No. 93–1453, 93d Cong., 2d Sess. (1974),

*reprinted in* 1974 U.S.C.C.A.N. 6351, 6353. The *Code of Judicial Conduct* was drafted under sponsorship of the American Bar Association by a committee chaired by former California Chief Justice Roger J. Traynor. The other committee members included Justice Potter Stewart of the U.S. Supreme Court, Judge Irving R. Kaufman of the U.S. Court of Appeals for the Second Circuit, and Judge Edward T. Gignoux of the U.S. District Court for the District of Maine.